RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0308p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

CAROLE L. HUGHES; HARRY HUGHES,
                  *Plaintiffs-Appellants*,

     v.

JOHN B. MCCARTHY, Medicaid Director,
                  *Defendant-Appellee*.

No. 12-3765

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 5:10-cv-01781—Benita Y. Pearson, District Judge.

Argued: March 7, 2013

Decided and Filed: October 25, 2013

Before: KETHLEDGE, WHITE, and STRANCH, Circuit Judges.[*]

_____

## COUNSEL

**ARGUED:** William J. Browning, BROWNING, MEYER & BALL, CO. LPA, Worthington, Ohio, for Appellants. Rebecca L. Thomas, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** William J. Browning, BROWNING, MEYER & BALL, CO. LPA, Worthington, Ohio, for Appellants. Rebecca L. Thomas, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. René H. Reixach, WOODS OVIATT GILMAN LLP, Rochester, New York, Eugene P. Whetzel, OHIO STATE BAR ASSOCIATION, Columbus, Ohio, Howard S. Scher, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, Washington, D.C., for Amici Curiae.

_____

[*]We amend the caption as reflected in this opinion.

———————————

## OPINION

———————————

HELENE N. WHITE, Circuit Judge.    Plaintiffs Carole and Harry Hughes (collectively, the Hugheses), a nursing home resident and her community spouse, appeal the district court's grant of summary judgment in favor of the director of the Ohio Department of Job and Family Services (ODJFS or the Ohio agency),[1] holding that the Ohio agency properly penalized Mrs. Hughes based on Mr. Hughes's purchase of an annuity for himself with funds from his IRA account.    The district court held that 42 U.S.C. § 1396r-5(f)(1)[2] precluded the transfer of assets because it exceeded Mr. Hughes's community spouse resource allowance (CSRA).    Because the transfer occurred before the Ohio agency determined that Mrs. Hughes was eligible for Medicaid coverage and § 1396p(c)(2)(B)(i) permits an unlimited transfer of assets "to another for the sole benefit of the individual's spouse," we REVERSE.

## I.

## A.

Congress established the Medicaid program in 1965 to provide federal and state funding of medical care for individuals who cannot afford to cover their own medical costs.  *See* Social Security Amendments of 1965, Title XIX, Grants to States for Medical Assistance Programs, Pub. L. No. 89–97, 79 Stat. 286, 343–52 (codified as amended at

---

[1]Since this case's inception, ODJFS has been reorganized.  The duties and legal responsibilities of the director of ODJFS have been transferred to the state Medicaid director.  *See* Am. Sub. H.B. No. 59, 2013 Ohio Laws 25 (provisions to be codified).  In this opinion, we refer to the state Medicaid agency as the Ohio agency.

[2]This provision reads:

> An institutionalized spouse may, without regard to section 1396p(c)(1) . . . , transfer an amount equal to the community spouse resource allowance . . . , but only to the extent the resources of the institutionalized spouse are transferred to (or for the sole benefit of) the community spouse.  The transfer under the preceding sentence shall be made as soon as practicable after the date of the initial determination of eligibility . . . .

42 U.S.C. § 1396r-5(f)(1).

42 U.S.C. §§ 1396–1396w-5); *Harris v. McRae*, 448 U.S. 297, 301 (1980). The program is administered by the Secretary of Health and Human Services (HHS or the federal agency), who in turn exercises her authority through the Centers for Medicare and Medicaid Services (CMS).[3] To implement the program, "[e]ach participating State develops a plan containing reasonable standards . . . for determining eligibility for and the extent of medical assistance within boundaries set by the Medicaid statute[s] and the Secretary of [HHS]." *Wis. Dep't of Health & Family Servs. v. Blumer*, 534 U.S. 473, 479 (2002) (internal quotation marks omitted); *see* 42 U.S.C. § 1396a(17).

In 1988, Congress passed the Medicare Catastrophic Coverage Act (MCCA), Pub. L. No. 100–360, 102 Stat. 683, "to protect community spouses from 'pauperization' while preventing financially secure couples from obtaining Medicaid assistance. To achieve this aim, Congress installed a set of intricate and interlocking requirements with which States must comply in allocating a couple's income and resources." *Blumer*, 534 U.S. at 480 (internal citation and parenthetical omitted). In particular, the MCCA allows the community spouse to keep a portion of the couple's assets—the CSRA—without affecting the institutionalized spouse's Medicaid eligibility.[4] *See* 42 U.S.C. § 1396r-5(c)(2), (f)(2)(A). As the first step in determining the CSRA, the total of all the couple's resources is calculated as of the time the institutionalized spouse's institutionalization began; half of that total is allocated to each spouse (the spousal share). *Id.* § 1396r-5(c)(1)(A). Once the spousal share is determined, the CSRA is calculated by measuring the spousal share allocated to the community spouse against a statutory formula, which is further defined under each state plan, and subject to a ceiling and floor indexed for inflation. *Id.* § 1396r-5(c)(2)(B), (f)(2), (g).

"The CSRA is considered unavailable to the institutionalized spouse in the eligibility determination, but all resources above the CSRA (excluding a small sum set

[3] Until 2001, CMS was known as the Health Care Financing Administration. *See* CMS; State of Organization, Functions and Delegations of Authority; Reorganization Order, 66 Fed. Reg. 35437-03 (July 5, 2001).

[4] As relevant here, the term "institutionalized spouse" means an individual who is in a nursing facility and is married to a spouse who is not in a nursing facility. The term "community spouse" means the spouse of an institutionalized spouse. 42 U.S.C. § 1396r-5(h)(1)–(2).

aside as a personal allowance for the institutionalized spouse . . . ) must be spent before eligibility can be achieved." *Blumer*, 534 U.S. at 482–83 (citing 42 U.S.C. § 1396r-5(c)(2)). However, a community spouse's income is not considered available to the institutionalized spouse for eligibility purposes, except in limited circumstances. *See* 42 U.S.C. § 1396r-5(b). Moreover, "after the month in which an institutionalized spouse is determined to be eligible for benefits . . . , no resources of the community spouse shall be deemed available to the institutionalized spouse." *Id.* § 1396r-5(c)(4).

**B.**

A state plan must "comply with the provisions of [§] 1396p . . . with respect to liens, adjustments and recoveries of medical assistance correctly paid,[] transfers of assets, and treatment of certain trusts." 42 U.S.C. § 1396a(18) (internal footnote omitted). Paragraph (1) of § 1396p(c) requires (in relevant part) that a state plan "must provide that if an institutionalized individual or the spouse of such an individual . . . disposes of assets for less than fair market value on or after the look-back date" (which, as relevant here, is defined as thirty-six months prior to the first date on which the institutionalized spouse applies for Medicaid assistance), "the individual is ineligible for medical assistance for services" (such as coverage for nursing home costs) for the numbers of months that the assets would have covered the average monthly cost of such services. *Id.* § 1396p(c)(1)(A); *see id.* § 1396p(c)(1)(B)(i)–(ii), (C)(i)(I), (D)(ii), (E)(i).

In other words, even if the institutionalized spouse is eligible for Medicaid coverage after spending down her assets, § 1396p(c) requires a state to impose a transfer penalty (a period of restricted coverage) if either spouse disposed of assets for less than fair market value during the look-back period. However, the transfer penalties under paragraph (1) do not apply in certain circumstances. As relevant here: "An individual shall not be ineligible for medical assistance by reason of paragraph (1) to the extent that . . . (B) the assets [] (i) were transferred to the individual's spouse or to another for the sole benefit of the individual's spouse[.]" *Id.* § 1396p(c)(2)(B)(i). Congress amended § 1396p(c)(2)(B) to its current form in 1993. *See* Omnibus Budget

Reconciliation Act (OBRA) of 1993, Pub. L. No. 103–66, § 13611(a)(2), 107 Stat. 312; MCCA of 1988, Pub. L. No. 100–360, § 303(b), 102 Stat. 683.

Congress later passed the Deficit Reduction Act of 2005 (DRA), Pub. L. No. 109–171, 120 Stat. 4, 62–64, as amended by the Tax Relief and Health Care Act of 2006, Pub. L. No. 109–432, 120 Stat. 2922, 2998, which added provisions to paragraph (1) concerning whether the purchase of certain annuities should be deemed transfers for less than fair market value. *See* 42 U.S.C. § 1396p(c)(1)(F), (G). Congress did not, however, amend § 1396p(c)(2)(B) with the DRA's enactment.

## II.

### A.

Mrs. Hughes entered a nursing home in 2005. For nearly four years, Mr. Hughes paid for his wife's nursing home costs using the couple's resources, which largely consisted of funds from his IRA account. In June 2009, about three months before Mrs. Hughes applied for Medicaid coverage, Mr. Hughes purchased a $175,000 immediate single-premium annuity for himself using funds from his IRA account. The annuity guarantees monthly payments of $1,728.42 to Mr. Hughes from June 2009 to January 2019, totaling nine years and seven months, which is commensurate with Mr. Hughes's undisputed actuarial life expectancy. Combined with other retirement income, the annuity increased Mr. Hughes's monthly income to $3460.64 after the annuity took effect. In the event of Mr. Hughes's death, Mrs. Hughes is the first contingent beneficiary and the Ohio agency is "the remainder beneficiary for the total amount of medical assistance furnished to annuitant['s] spouse, [Mrs.] Hughes."

Mrs. Hughes applied for Medicaid coverage in September 2009. In December 2009, the Stark County division of the Ohio agency issued a notice that she was eligible for Medicaid as of the month of her application. However, the Ohio agency placed her on restricted coverage from September 2009 to June 2010, deeming her ineligible for coverage of nursing home costs for that time period because of Mr. Hughes's annuity purchase.

The Ohio agency determined that Mr. Hughes's annuity purchase was an improper transfer because he used a community resource (the IRA account) in an amount that exceeded his CSRA of $109,560 and because the annuity failed to name Ohio as the first contingent beneficiary. Thus, the Ohio agency placed Mrs. Hughes on restricted coverage for approximately ten months, the number of months that the difference between Mr. Hughes's CSRA and the annuity would have paid for nursing home costs. The Hugheses appealed the decision. The Ohio agency affirmed in a state-hearing and administrative-appeal level decision. State-court proceedings have been stayed pending this case's resolution.

## B.

In August 2010, the Hugheses filed this case under 42 U.S.C. § 1983, alleging that the Ohio agency violated the federal Medicaid statutes, including § 1396p(c)(2)(B)(i), when it placed Mrs. Hughes on restricted coverage due to Mr. Hughes's purchase of an annuity with funds from his IRA account.[5] They claimed, inter alia, that the Medicaid statutes grant them the right to purchase an actuarially-sound[6] immediate single-premium annuity for the sole benefit of the community spouse.

The district court granted summary judgment in favor of the Ohio agency and denied the Hugheses' request for injunctive relief. *See Hughes v. Colbert*, 872 F. Supp. 2d 612 (N.D. Ohio 2012).[7] Notwithstanding the Hugheses' argument that § 1396p(c)(2)(B)(i) allows an institutionalized spouse to transfer unlimited assets to her community spouse without the transaction being considered an improper transfer, the

---

[5]The Hugheses were originally joined by another couple as plaintiffs, who are no longer parties to this action.

[6]An annuity is actuarially sound where the entire expected return from the annuity is commensurate with a reasonable estimate of the annuitant's expected lifetime, as determined by the actuarial tables published by the Office of the Actuary of the Social Security Administration. *See* State Medicaid Manual § 3258.9(B).

[7]The district court rejected the Ohio agency's argument that the court should abstain from exercising jurisdiction over this case pursuant to the *Younger* abstention doctrine, and ruled that the Medicaid statutes cited by the Hugheses conferred enforceable rights under § 1983. The Ohio agency does not contest these rulings, and neither issue affects our jurisdiction. Further, the Hugheses do not challenge the district court's dismissal of their equal protection claim or their claim that certain Ohio Medicaid regulations are preempted by Federal law. We deem these issues abandoned.

court ruled that § 1396r-5(f)(1) precludes the transfer of assets to the community spouse that exceeds the CSRA and applies to the pre-eligibility transfer at issue here; and that § 1396r-5's supersession clause "requires resolution of any inconsistency between [§ 1396r-5(f)(1)] and § 1396p(c)(2)(B) in the former clause's favor." *Id.* at 622–23. The Hugheses timely appealed.

**III.**

**A.**

We review de novo the district court's grant of summary judgment, as well as its interpretation of federal statutes. *Cnty. of Oakland v. Fed. Hous. Fin. Agency*, 716 F.3d 935, 939 (6th Cir. 2013). In reviewing questions of statutory interpretation, we employ a three-step framework:

> [F]irst, a natural reading of the full text; second, the common-law meaning of the statutory terms; and finally, consideration of the statutory and legislative history for guidance. The natural reading of the full text requires that we examine the statute for its plain meaning, including the language and design of the statute as a whole. If the statutory language is not clear, we may examine the relevant legislative history.

*Elgharib v. Napolitano*, 600 F.3d 597, 601 (6th Cir. 2010) (citations and internal quotation marks omitted).

To the extent that HHS has issued guidance on the federal Medicaid statutes in the form of opinion letters, an agency manual, and an amicus brief that lack the force law, its statutory interpretations are not afforded deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), but "are 'entitled to respect' under . . . *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), . . . only to the extent that those interpretations have the 'power to persuade[.]'" *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000) (internal citation altered); *see In re Carter*, 553 F.3d 979, 987–88 (6th Cir. 2009) (applying *Skidmore* to the amicus brief filed by a federal agency charged with administering a statutory scheme); *Caremark, Inc. v. Goetz*,

480 F.3d 779, 787 (6th Cir. 2007) (applying *Skidmore* to interpretations of Medicaid statutes set forth by CMS).

**B.**

The primary issue on appeal is whether the transfer of a community resource to purchase an annuity for the community spouse's sole benefit, which transfer is done after the institutionalized spouse is institutionalized but before the institutionalized spouse's Medicaid eligibility is determined, can be deemed an improper transfer under 42 U.S.C. § 1396r-5(f)(1), even though § 1396p(c)(2)(B)(i) allows a transfer of assets "to another for the sole benefit of the individual's spouse."[8]  The district court accepted the Ohio agency's argument that a transfer of assets that exceeds the CSRA, even if made before the Ohio agency determined that Mrs. Hughes was eligible for Medicaid coverage, was improper under 42 U.S.C. § 1396r-5(f)(1) and that this provision supersedes § 1396p(c)(2)(B)(i) per the MCCA supersession clause, § 1396r-5(a)(1).

We reject the district court's approach.  Section 1396r-5(f)(1) reads:

> An institutionalized spouse may, without regard to section 1396p(c)(1) . . . , transfer an amount equal to the community spouse resource allowance . . . , but only to the extent the resources of the institutionalized spouse are transferred to (or for the sole benefit of) the community spouse.  The transfer under the preceding sentence shall be made as soon as practicable after the date of the initial determination of eligibility . . . .

42 U.S.C. § 1396r-5(f)(1).

The provision begins in permissive, not prohibitive, terms.  The Ohio agency acknowledges that "the first sentence tells us that a transfer to the community spouse up to the CSRA is allowed."  That same sentence states that such transfer is permitted

---

[8]The Ohio agency concedes that Mr. Hughes's annuity was not a countable resource in determining his wife's Medicaid eligibility.  Indeed, the Ohio agency determined that Mrs. Hughes was eligible for Medicaid, but placed her on restricted coverage because it deemed improper the transfer of funds from Mr. Hughes's IRA account to purchase the annuity.  Thus, we need not decide the question whether the annuity may be considered a countable resource in the initial eligibility determination.  *See Lopes v. Dep't of Soc. Servs.*, 696 F.3d 180, 188 (2d Cir. 2012) (holding that the payment stream from a non-assignable annuity is not a resource for purposes of determining Medicaid eligibility); *Morris v. Okla. Dep't of Human Servs.*, 685 F.3d 925, 932–33 & n.5 (10th Cir. 2012) (collecting case-law).

notwithstanding § 1396p(c)(1), which governs transfer penalties. The next sentence provides that this permitted transfer "shall be made as soon as practicable *after* the date of the initial determination of eligibility." (emphasis added). It does not say anything about a transfer made *before* the initial determination of eligibility, let alone that any pre-eligibility transfer that exceeds the CSRA is subject to a transfer penalty.

Tellingly, § 1396r-5(f)(1) is a CSRA provision. It does not appear within § 1396p(c)(1)'s framework, which imposes restricted coverage for the disposal of assets for less than fair market value during the look-back period. Even assuming that § 1396r-5(f)(1) provides authority for a state to impose a period of ineligibility for a transfer that exceeds the CSRA,[9] the statutory language and its relationship with § 1396p(c) do not support the Ohio agency's argument that § 1396r-5(f)(1) controls a transfer made before Medicaid eligibility is established. Thus, § 1396r-5(f)(1) does not supersede § 1396p(c)(2)(B)(i) for pre-eligibility transfers because there is no inconsistency between the provisions.

On this point, we join the Tenth's Circuit's holding: "To avoid rendering § 1396p(c)(2)(B)(i) superfluous, we agree that it and § 1396r-5(f)(1) must be read to operate at distinct temporal periods: one period during which unlimited spousal transfers are permitted, and one period during which transfers may not exceed the CSRA." *Morris v. Okla. Dep't of Human Servs.*, 685 F.3d 925, 935 (10th Cir. 2012). When assets are transferred "to the individual's spouse or to another for the sole benefit of the individual's spouse," 42 U.S.C. § 1396p(c)(2)(B)(i), before the institutionalized spouse is determined eligible for Medicaid coverage, "the unlimited transfer provision of § 1396p(c)(2) controls, and [a] transfer penalty [is] improper [under § 1396r-5(f)(1)]."[10] *Morris*, 685 F.3d at 938.

---

[9]"A State . . . may not provide for any period of ineligibility for an individual due to transfer of resources for less than fair market value except in accordance with this subsection [(i.e., § 1396p(c))]." 42 U.S.C. § 1396p(c)(4). The provisions therein do not expressly include penalties for a transfer that exceeds the CSRA.

[10]The Supreme Court also has referenced § 1396r-5(f)(1) with a post-eligibility understanding. *See Blumer*, 534 U.S. at 482 n.5.

In response to *Morris*'s holding, the Ohio agency asks us to follow an unpublished district court opinion, *Burkholder v. Lumpkin*, No. 3:09-cv-1878, 2010 WL 522843 (N.D. Ohio Feb. 9, 2010). But *Burkholder* does not support its position because, in that case, the district court held that "§ 1396r-5(f) supersedes § 1396p(c)(2) where . . . the transfer of assets from the institutionalized spouse to the community spouse occurs after the initial eligibility determination." *Id.* at *7. By contrast, the Ohio agency seeks to impose a penalty for a transfer that occurred before it found Mrs. Hughes eligible for coverage.

Further, the two primary state-court cases the Ohio agency cites in support—*Feldman v. Department of Children & Families*, 919 So.2d 512 (Fla. Dist. Ct. App. 2005), and *McNamara v. Ohio Department of Human Services*, 744 N.E.2d 1216 (Ohio Ct. App. 2000)—are unpersuasive.[11] Neither state-court decision engages in any meaningful analysis of the statutory text. Indeed, one commentator has noted that such rulings are "inconsistent with statutory authority" and based on "antipathy" toward alleged sheltering of assets. Eric M. Carlson, Long-Term Care Advocacy § 7.12(5)(e)(ii)(A) (Matthew Bender 2012). "Policy [rationales] cannot prevail over the text of a statute." *Tran v. Gonzales*, 447 F.3d 937, 941 (6th Cir. 2006).

Our reading of the statute is supported by HHS's guidance. In its amicus brief, HHS explains that § 1396r-5(f)(1) "has nothing to say about the inter-spousal transfers that are permissible before a determination of eligibility." The federal agency's State Medicaid Manual confirms that § 1396r-5(f)(1) applies to post-eligibility reallocation of resources and that § 1396p(c)(2)(B)(i) permits transfers to a third party for the sole benefit of the individual's spouse. *See* State Medicaid Manual §§ 3258.11, 3262.4. HHS has taken the same position in a series of opinion letters issued to state plan administrators and to the public, reasoning that § 1396r-5(f)(1) does not conflict with, and thus does not supersede, § 1396p(c)(2)(B), as the two provisions apply to different situations, before and after eligibility is established; and that permitting inter-spousal

---

[11]Unlike this case, the at-issue financial product in *McNamara* was an "annuitized" trust rather than a standard commercial annuity. *See* 744 N.E.2d at 1221.

transfers under § 1396p(c)(2)(B) does not render § 1396r-5(f)(1) a nullity, as the latter provision still has meaning with respect to resource allocation after eligibility is established. We agree with amici curiae, the National Academy of Elder Law Attorneys and the Ohio State Bar Association (who appear in support of the Hugheses), that HHS's view on this issue represents a "well thought out explanation of the differences between these two statutes" and thus is due respect under *Skidmore*.

The Ohio agency argues that Congress intended a different result, one that would subordinate § 1396p(c)(2)(B)(i) to § 1396r-5(f)(1)'s CSRA transfer cap. But the statutory text does not provide any indication of such an intent for the reasons described. Moreover, the legislative history does not support the Ohio agency's contention. A Senate amendment to H.R. 2264 (the bill that ultimately became OBRA, which enacted § 1396p(c)(2)(B)(i)) would have subjected the unlimited-transfer provision to § 1396r-5(f)(1)'s CSRA transfer cap. *See* 139 Cong. Rec. 7913-01, 7986 (1993) (bill passes the Senate with amendment); *id.* at 8013 (amending § 1396p(c)(2)(B)(i) to provide that "(B) the resources-(i) were transferred to the individual's spouse or to another for the sole benefit of the individual's spouse *and did not exceed the amount permitted under section 1924(f)(1)*" (emphasis added)). In a conference report, the House of Representatives receded from its disagreement with the Senate amendment, but nevertheless offered substitute language that dropped the reference to § 1396r-5(f)(1), and provided the current language of § 1396p(c)(2)(B)(i), which was adopted. H.R. Rep. 103-213, at 1, 324 (1993) (Conf. Rep.), *reprinted in* 1993 U.S.C.C.A.N. 1088. That Congress declined to adopt language supporting the very construction of § 1396p(c)(2)(B)(i) that the Ohio agency now advances is a "compelling" indication of its intent not to subordinate § 1396p(c)(2)(B)(i) to § 1396r-5(f)(1). *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442–43 (1987) ("Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." (internal quotation marks omitted)).

**C.**

The Ohio agency raises two alternate grounds for affirmance. To the extent it did not raise the issues before the district court, we address them to promote finality in this litigation, as the issues require no further factual development and have been sufficiently presented for our review. *See In re Morris*, 260 F.3d 654, 664 (6th Cir. 2001).

**1.     Section 1396p(c)(2)(B)(i)'s sole-benefit rule**

The Ohio agency argues that the transfer of a community resource to purchase an annuity by or on behalf of the community spouse cannot be "for the sole benefit of the individual's spouse" under § 1396p(c)(2)(B)(i) if—as here—the annuity designates the institutionalized spouse as the first contingent beneficiary and the Ohio agency as the second contingent beneficiary to receive payments in the event of the community spouse's early death, even if the annuity is actuarially sound and payments are made only to the spouse during his life. We disagree.

The statute does not define the term "sole benefit." Nor is the term defined by federal regulation. The Ohio agency's position on this issue rests primarily on the plain meaning of the word "sole," citing dictionaries and other authorities for the proposition that the word means "'only,' 'solitary,' 'single' or 'exclusive.'" But what a dictionary does not tell us is whether a transfer of assets "to another for the sole benefit of the individual's spouse" means (as HHS contends in its amicus brief and the Hugheses contend in their second supplemental brief) that the transfer may benefit only the spouse during his life but may include contingent beneficiaries, so long as the financial instrument is actuarially sound and payments are made only to the spouse during his life; or (as the Ohio agency contends) that the transfer may benefit only the spouse at the time of the transfer and also thereafter, such that any remaining assets in the event of the spouse's early death cannot pass to a contingent beneficiary. *Cf.* Sanford J. Schlesinger and Barbara J. Scheiner, Medicaid After OBRA '93, 21 Est. Plan. 74, 76 (1994) (opining that it is an open question whether, under the sole-benefit rule, "a trust for the sole

benefit of the spouse for life, with the remainder to someone else, [would] be a trust for the sole benefit of the spouse").

The Ohio agency argues that HHS's position on this issue is inconsistent. The State Medicaid Manual, § 3258.11, explains:

> The exception for transfers to a third party for the sole benefit of the spouse may have greater impact on eligibility because resources may potentially be placed beyond the reach of either spouse and thus not be counted for eligibility purposes. However, for the exception to be applicable, the definition of what is for the sole benefit of the spouse (see § 3257) must be fully met. This definition is fairly restrictive, in that it requires that any funds transferred be spent for the benefit of the spouse within a time-frame actuarially commensurate with the spouse's life expectancy. If this requirement is not met, the exemption is void, and a transfer to a third party may then be subject to a transfer penalty.

In turn, § 3257 of the manual states:

> A transfer is considered to be for the sole benefit of a spouse, blind or disabled child, or a disabled individual if the transfer is arranged in such a way that no individual or entity except the spouse, blind or disabled child, or disabled individual can benefit from the assets transferred in any way, whether at the time of the transfer or at any time in the future.

*Id.* § 3257.

Although the phrase "at any time in the future" might be interpreted to mean that contingent beneficiaries cannot be named in the financial instrument, this is not the federal agency's position. As HHS has reasoned in its amicus brief and in a prior opinion letter, the designation of contingent beneficiaries to receive funds remaining in an annuity in the event of the spouse's early death would not necessarily violate the sole-benefit rule, so long as the annuity is actuarially sound and provides for payments only to the spouse during his life. *Accord Mertz v. Houstoun*, 155 F. Supp. 2d 415, 426 n.14 (E.D. Pa. 2001) ("If an annuitant receives the amount invested [plus interest] during his lifetime, the annuity is actuarially sound and for his sole benefit.").

HHS's position is mirrored by Ohio's implementing regulation:

A transfer for the sole benefit of the spouse, blind or disabled child or disabled individual in which there is a provision within the trust, contract or other binding instrument to expend all of the transferred resources [for the benefit of the individual during that individual's life expectancy] may provide for other beneficiaries.

Ohio Admin. Code § 5101:1-39-07(F)(1).**[12]**

The Ohio agency asserts that HHS's position and its state's regulation are wrong. But if we were to adopt the Ohio agency's definition of sole benefit, it is difficult to conceive what type of financial arrangement could meet it. Under the definition urged by the Ohio agency, it acknowledges that, "universally, . . . it seems that no annuity (or at least no typical annuity) could meet this [definition] because it seems to be typical that an annuity instrument names at least one [contingent] beneficiary." We take its reasoning two steps further. Even if an annuity or another financial arrangement does not designate a contingent beneficiary, or even if the arrangement (such as a pure life annuity) expressly provides that payments shall terminate upon the spouse's death, someone other than the spouse will benefit. In the first scenario, the presence of contingent beneficiaries is a certainty under the law whether the beneficiaries are designated in the financial instrument, in the spouse's will, or by the Ohio statute of descent and distribution, Ohio Rev. Code. § 2105.06. In the second scenario, the entity that issued the financial product will benefit upon forfeiture of future payment.

Were we to adopt the Ohio agency's definition, no transfer "to another for the sole benefit of the individual's spouse" under most standard financial arrangements could satisfy § 1396p(c)(2)(B)(i). We reject this "acontextual approach to statutory interpretation." *Flores v. Rios*, 36 F.3d 507, 513 (6th Cir. 1994); *see Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory

---

**[12]**As another source of guidance, the Social Security Administration—in setting forth its policy that a special needs trust must be for the sole benefit of the designated individual—has defined the term to mean that the trust must benefit no one but that individual, "whether at the time the trust is established or at any time for the remainder of the individual's life." Social Security Program Operations Manual System (POMS), SI 011120.201(F)(2).

construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.").

We cannot presume that Congress operated in a vacuum when it enacted § 1396p(c)(2)(B)(i). By providing that a couple may transfer assets "to *another* for the sole benefit of the individual's spouse," the term "another" is not limiting. It naturally encompasses standard financial arrangements (such as an annuity) crafted for the spouse's sole benefit during his life. Our reading is supported by HHS, which takes the position that the term "another" includes an entity that issues the annuity. In this context, HHS's construction of the sole-benefit rule gives the statute meaning. The actuarial-soundness requirement reasonably assures that the assets were transferred to a third party for the individual spouse's sole benefit. Any contingent interest becomes relevant only if the spouse dies early. To extend the sole-benefit requirement past a spouse's death is nonsensical. The federal agency's construction is reasonable, supported by the statutory structure, and, thus, due respect under *Skidmore*.

2.     **Whether an annuity that satisfies § 1396p(c)(2)(B)(i)'s sole-benefit rule must also satisfy the annuity rules under § 1396p(c)(1)(F)**

The Ohio agency argues the transfer of a community resource to purchase an annuity by or on behalf of the community spouse that satisfies § 1396p(c)(2)(B)(i)'s sole-benefit rule must also satisfy the annuity rules under § 1396p(c)(1)(F), and that because Mr. Hughes's annuity does not name Ohio as "the remainder beneficiary in the first position," it fails to satisfy § 1396p(c)(1)(F).[13] However, its reading of the two provisions defies the text and structure of the statute.

As the Hugheses correctly contend in their second supplemental brief, an annuity that satisfies § 1396p(c)(2)(B)(i) need not satisfy § 1396p(c)(1)(F). The annuity rules

---

[13]The Ohio agency does not dispute that Mr. Hughes's annuity would satisfy § 1396p(c)(1)(F) if it named Ohio as the first contingent beneficiary for at least the total amount of medical assistance paid on behalf of the institutionalized spouse and Mrs. Hughes as the second contingent beneficiary. To the extent the transfer here (based on Mr. Hughes's purchase of an annuity) is not for fair market value under § 1396p(c)(1)(F), it is because of the contingent remainder interest held by the institutionalized spouse, the value of which was not transferred because it is retained by her.

under § 1396p(c)(1)(F) fall within § 1396p(c)(1)'s (paragraph (1)) overall transfer-penalty regime:

> "For purposes of **this paragraph**, the purchase of an annuity shall be treated as the disposal of an asset for less than fair market value unless–
>
>> (i) the State is named as the remainder beneficiary in the first position for at least the total amount of medical assistance paid on behalf of the institutionalized individual under this subchapter; or
>>
>> (ii) the State is named as such a beneficiary in the second position after the community spouse or minor or disabled child and is named in the first position if such spouse or a representative of such child disposes of any such remainder for less than fair market value.

42 U.S.C. § 1396p(c)(1)(F) (emphasis added).  On the other hand, § 1396p(c)(2)(B)(i) is an exception to transfer penalties under paragraph (1):

> An individual shall not be ineligible for medical assistance **by reason of paragraph (1)** to the extent that-- (B) the assets-- (i) were transferred to the individual's spouse or to another for the sole benefit of the individual's spouse[.]

*Id.* § 1396p(c)(2)(B)(i) (emphasis added).

In its amicus brief, HHS takes the position that an annuity that satisfies § 1396p(c)(2)(B)(i)'s sole-benefit rule must also satisfy § 1396p(c)(1)(F).  It does so without any reference to the statutory text, meaningful analysis, or reference to authority. The only proffered support for HHS's position is a 2006 CMS letter enclosure concerning the treatment of annuities under the DRA.  In that letter, the federal agency reasoned:

> Unlike the new section 1917(c)(1)(G)[**14**] added by section 6012(c) of the DRA . . . , section 1917(c)(1)(F) does not restrict application of its requirements only to an annuity purchased by or on behalf of an annuitant who has applied for medical assistance for nursing facility or other long termcare services.    Therefore, we interpret section 1917(c)(1)(F) as applying to annuities purchased by an applicant or by a spouse, or to transactions made by the applicant or spouse.

CMS, Changes in Medicaid Annuity Rules under the DRA of 2005 § II.B (July 27, 2006).

As the Ohio agency acknowledges, HHS applies § 1396p(c)(1)(F) to an annuity that otherwise satisfies § 1396p(c)(2)(B)(i) without acknowledging or addressing the structure of § 1396p(c), which places § 1396p(c)(1)(F) within paragraph (1)'s transfer-penalty framework and specifically sets forth § 1396p(c)(2)(B)(i)'s sole-benefit rule as an exception to paragraph (1).  HHS's rationale lacks reasoning and contravenes the plain language of § 1396p(c)(2)(B)(i) and § 1396p(c)(1)(F).  Thus, we decline to afford its interpretation respect under *Skidmore*.  *See Flores v. USCIS*, 718 F.3d 548, 554–55 (6th Cir. 2013).

---

[**14**] The provision provides:

(G) For purposes of this paragraph with respect to a transfer of assets, the term "assets" includes an annuity purchased by or on behalf of an annuitant who has applied for medical assistance with respect to nursing facility services or other long-term care services under this subchapter unless--

> (i) the annuity is-- (I) an annuity described in subsection (b) or (q) of section 408 of the Internal Revenue Code of 1986 [Title 26, U.S.C.A.]; or (II) purchased with proceeds from-- (aa) an account or trust described in subsection (a), (c), or (p) of section 408 of such Code; (bb) a simplified employee pension (within the meaning of section 408(k) of such Code); or (cc) a Roth IRA described in section 408A of such Code; or

> (ii) the annuity-- (I) is irrevocable and nonassignable; (II) is actuarially sound (as determined in accordance with actuarial publications of the Office of the Chief Actuary of the Social Security Administration); and (III) provides for payments in equal amounts during the term of the annuity, with no deferral and no balloon payments made.

42 U.S.C. § 1396p(c)(1)(G) (internal paragraph formatting altered).  We need not address the Hugheses' argument that the annuity is saved by § 1396p(c)(1)(G) given our disposition of this appeal on other grounds.

Rather than adopt HHS's rationale, the Ohio agency asks us to hold that Congress could not have enacted § 1396p(c)(1)(F) without intending it to supplement the earlier and more general provision of § 1396p(c)(2)(B)(i).

We disagree with the Ohio agency's characterization of the two provisions. Although "it is axiomatic that a general provision yields to a specific provision when there is a conflict," *Reg'l Airport Auth. of Louisville v. LFG, LLC*, 460 F.3d 697, 716 (6th Cir. 2006), there is no inherent conflict between the two provisions, and each provision is specific in its own way. Section 1396p(c)(1)(F) purports to govern all annuities through the imposition of a transfer penalty under paragraph (1) if the annuity does not satisfy certain rules. On the other hand, § 1396p(c)(2)(B)(i) carves out an exception to paragraph (1)'s transfer penalties. The language of § 1396p(c)(1)(F) limits its annuity rules "[f]or purposes of this paragraph." The language of § 1396p(c)(2)(B)(i) provides that "[a]n individual shall not be ineligible for medical assistance by reason of paragraph (1)" if a transfer satisfies, in relevant part, the sole-benefit rule. The two provisions complement rather than contradict one another.[15] Section 1396p(c)(1)(F) is not rendered illusory. It applies to all annuities not excepted by another provision such as § 1396p(c)(2)(B), including annuities benefiting non-exempt children or a spousal annuity that is not actuarially sound.

Because the provisions are not in conflict, that Congress enacted § 1396p(c)(1)(F) after § 1396p(c)(2)(B)(i) does not support a finding that § 1396p(c)(2)(B)(i) must give way to the newer provision, § 1396p(c)(1)(F). *See United States v. Clay*, 982 F.2d 959, 963 (6th Cir. 1993) ("When interpreting the effect of a new law upon an old one, '[o]nly a clear repugnancy between the old law and the new results

---

[15]With respect to annuity disclosures, 42 U.S.C. § 1396p(e)(1) provides that the Medicaid application must include "a statement that under paragraph (2) the State becomes a remainder beneficiary under such an annuity or similar financial instrument by virtue of the provision of such medical assistance." The referenced "paragraph 2" of subsection (e) limits itself to annuities that are subject to § 1396p(c)(1)(F)'s annuity rules (such as naming the state as the remainder beneficiary). *See id.* § 1396p(e)(2)(A) ("In the case of disclosure concerning an annuity under subsection (c)(1)(F) of this section, the State shall notify the issuer of the annuity of the right of the State under such subsection as a preferred remainder beneficiary in the annuity for medical assistance furnished to the individual."). Thus, subsection (e) reenforces the conclusion that § 1396p(c)(1)(F) does not control all annuities.

in the former giving way and then only *pro tanto* to the extent of the repugnancy.'" (alteration in original) (quoting *Georgia v. Penn. R. Co.*, 324 U.S. 439, 457 (1945))).

Last, the Ohio agency's reference to floor statements by members of Congress—indicating in general terms that the DRA was enacted to close loopholes related to the purchase of annuities—is unavailing given that the statutory language unambiguously limits § 1396p(c)(1)(F) to paragraph (1) and § 1396p(c)(2)(B)(i) is an exception to paragraph (1)'s transfer penalties and was unamended by the DRA.[16] *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 457 n.15 (2002) (noting that floor statements cannot override clear statutory text); *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." (internal citations and quotation marks omitted)). If Congress prefers the interpretation that applies § 1396p(c)(1)(F) notwithstanding § 1396p(c)(2)(B)(i), it need only amend the statute.

## IV.

For the foregoing reasons, we REVERSE the district court's judgment and remand for further proceedings consistent with this opinion.

---

[16]In any event, such referenced statements do not reveal Congressional intent to subject § 1396p(c)(2)(B)(i) to § 1396p(c)(1)(F)'s annuity rules.